IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CINCINNATI INDUSTRIAL MACHINERY, INC., | : | Case No. 1:09-CV-604 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER DENYING PLAINTIFF'S |
| | : | MOTION FOR A PRELIMINARY |
| VMI HOLLAND BV, | : | INJUNCTION |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

This matter comes before the Court on Plaintiff's Motion for a Temporary Restraining

Order and Preliminary Injunction. (Doc. 2.)[1] The Court held a hearing on the Motion on

September 30, 2009.[2] At the close of the hearing, the parties indicated that they would attempt

to agree to terms that would amicably resolve Plaintiff's request for emergency relief. On

October 15, 2009, the Court held a status conference with the parties to ascertain whether they

_____

[1] Plaintiff also filed a Motion For Additional Time to Present Evidence Not Available for
September 30, 2009 Hearing (doc. 9) indicating that certain documents related to its claim of
misappropriation of trade secrets was not available in time for the hearing. The evidence
presented by Plaintiff at the hearing was sufficient for the Court to resolve the issues pertinent to
Plaintiff's request for injunctive relief on its misappropriation claim. Accordingly, Plaintiff's
Motion for Additional Time to Present Evidence will be denied.

[2] The transcript of the hearing ("Hrg. Tr.") is filed in several parts. Doc. 19 encompasses
the last fifteen minutes of the hearing; doc. 29 encompasses the testimony of Joseph Bohlen and
is sealed pursuant to Court order; doc. 32 encompasses the remainder of the hearing, including
the testimony of Piet Rademaker. Plaintiff introduced documents into evidence at the hearing
that are referred to herein as "Pl. Ex." Defendant also introduced documents at the hearing that
are identical to those attached to the Declaration of Piet Rademaker, filed as doc. 11. Those
documents are referred to herein as "Def. Ex."

had, in fact, reached resolution.  Attempts to reach an amicable resolution of the issues had been unsuccessful, but the parties and their counsel continued to work on terms of an agreed order that would bind the parties pending final resolution of the case.

On January 19, 2010, Defendant presented the Court with an eleven-paragraph Consent Order setting forth terms by which Defendant would abide, purportedly to resolve Plaintiff's request for emergency relief.  (Doc. 33-1.)  The same day, Plaintiff filed a Proposed Agreed Order that is similar to Defendant's Consent Order but adds four paragraphs setting forth additional restrictions and/or requirements directed at Defendant.  (Doc. 34-1.)  Both parties ask the Court to enter their proposed orders into the record.

The Court will enter Defendant's Consent Order into the record.  Binding Defendant to the terms of the Consent Order will address several of the issues raised in Plaintiff's Motion for Injunctive Relief.  Based on its consideration of the Consent Order, the evidence adduced at the hearing, and the standards applicable to requests for preliminary injunctive relief, the Court will DENY Plaintiff's Motion for a Preliminary Injunction.

# I.  BACKGROUND

## A.  FACTUAL BACKGROUND

Plaintiff Cincinnati Industrial Machinery, Inc. ("CIM") claims that Defendant VMI Holland BV ("VMI") has breached the terms of a license agreement between the parties and has misappropriated CIM's trade secrets.  (Doc. 1.)  In a 1973 license agreement between the parties (the "License Agreement" or "Agreement"), CIM[3] granted to VMI an exclusive, non-assignable

---

[3]  Cincinnati Cleaning & Finishing Machinery Co. ("Cincinnati") and Veluwse Machine Industrie B.V. ("Veluwse"), companies that were predecessors to CIM and VMI, respectively, were the original parties to the Agreement.  Because there is no dispute that the present parties

and non-transferrable license to make certain machinery and equipment (hereinafter "Cincinnati Products"). The Agreement divides the world into territories where VMI can sell Cincinnati Products exclusively, where CIM can sell the Products exclusively, and where VMI and CIM can compete on nonexclusive terms. (*See* doc. 1-2.) The Cincinnati Products at issue in this case are large machines designed to wash cans. These can-washing machines prepare cans for labeling and make them safe for use as food or beverage containers. The 1973 Agreement and subsequent amendments to the Agreement obligate VMI to pay royalties to CIM on all Cincinnati Products manufactured and sold under the Agreement. (*Id*.) A 1994 amendment to the Agreement specifies that "[t]he terms of the LICENSE AGREEMENT shall be continuing, until lawfully terminated by the parties hereto, as long as VMI uses the Technology or any CIM Improvement or Existing VMI Improvement to manufacture and sell Product." (Doc. 1-2 at 17.)

VMI was not in the business of manufacturing can washing machines until it entered the Agreement with CIM. Today, thirty-six years later, VMI is a major supplier in the can washing machine industry. VMI originally manufactured the can washing machines at a plant in Holland. However, since 2005, it has manufactured the machines at a plant in China. VMI paid royalties to CIM for every can washing machine it manufactured and sold until January 2009. Then, VMI determined that it was not actually using any of CIM's proprietary trade secrets. Based on that determination, VMI stopped making royalty payments and informed CIM that it doubted the validity of the Agreement. Specifically, VMI claimed that the can washing machine technology and systems that CIM says are trade secrets are in the public domain and that the Agreement requiring VMI to pay royalties is therefore an invalid restraint on trade. By letter dated June 9,

succeeded to the rights and obligations of Cincinnati and Veluwse under the Agreement, the Court will refer to CIM and VMI as the parties to the Agreement.

2009, VMI notified CIM that it regarded the Agreement as ended as of January 1, 2009. VMI continues to sell can washing machines that it is manufacturing at its plant in China.

**B. COMPLAINT AND MOTION FOR INJUNCTIVE RELIEF**

CIM's Complaint asserts that VMI's continued manufacture and sale of can washing machines breaches the License Agreement and constitutes the misappropriation of trade secrets. (Doc. 1.) Concurrent with the filing of the Complaint, CIM filed a Motion For A Temporary Restraining Order and Preliminary Injunction. (Doc. 2.) In that motion, CIM asks the Court to restrain and enjoin Defendant VMI Holland BV ("VMI") from the following:

(1) Manufacturing and/or selling any Cincinnati Products or any products that include CIM's trade secrets disclosed to VMI except as provided in the 1973 agreement between the parties (the "Agreement") and its subsequent amendments; (2) Manufacturing any Cincinnati Products or any products that include CIM's trade secrets outside VMI's plant at Epe, Holland; and (3) Divulging to any third party or using to their own advantage any of CIM's trade secrets except to the extent necessary to enable the manufacture of "Cincinnati Products" at VMI's plant in Epe, Holland. (*Id*.) Granting CIM this relief would require VMI to stop manufacturing can washers in China.

CIM additionally requests the Court to order VMI to do the following: (1) Pay all past due royalties as provided for in the Agreement; (2) Deliver written quarterly reports for the first two quarters of 2009 as provided for under Section 4(e) of the Agreement; (3) Make its books and records available for inspection by CIM for the purpose of checking all reports rendered to CIM by VMI under the Agreement; and (4) Disclose in detail to CIM all future VMI improvements and all new methods for cleaning and drying two-piece cans which have not

already been disclosed.  (*See id*.)

## C.  THE LICENSE AGREEMENT

The following portions of the 1973 License Agreement are relevant to the instant dispute: Paragraph 1(a) of the Agreement grants VMI "an exclusive license to make in its plant at Epe-[sic] Holland all Cincinnati Products listed in Schedule A . . . and to sell such machinery and equipment only in the Territory listed in Schedule B."  (Doc. 1-2.)  Paragraph 1(b) provides that "with respect to any patents, technical data, or know-how utilized under this Agreement by either party, each party acknowledges the validity of such patents, data, and know-how. . . ."  (*Id*.) Paragraph 1(c) provides that "[t]he rights given hereunder are personal to [VMI] and [VMI] shall not have the right to grant sub-licenses hereunder."  (*Id*.)  Paragraph 1(d) further provides that the "Agreement shall not be sold, assigned or transferred in whole or in part without the consent in writing of [CIM]."  (*Id*.)

The Agreement requires VMI to pay as royalties to CIM a percentage "of the net selling price on all Cincinnati Products and/or components thereof, and/or spare or replacement parts thereof, manufactured by or on behalf of [VMI] or by some other person or company to which any of the Know-How relating to the Cincinnati Products has been supplied by, or through, or on behalf of or at the instance of [VMI] and used, sold or otherwise disposed of."  (Agreement ¶ 4(a), doc. 1-2.)

The Agreement obligates VMI to do the following: pay royalty fees to CIM on a quarterly basis; keep accurate records showing all Cincinnati Products made and sold by it under the Agreement; deliver quarterly to CIM a written statement showing the amount of Cincinnati Products sold, the selling price of each product, and to whom it was sold; and to keep its books

and records open for inspection by CIM. (*Id*. ¶ 4(d), (e).) Regarding disclosure of CIM know-how, the Agreement provides that VMI "shall not disclose to anyone (otherwise than is necessary to enable the manufacture of Cincinnati Products hereunder) as long as this Agreement remains in force and effect, or after its cancellation, any technical information or Know-How which may be given by [CIM] to [VMI] in the manufacture of Cincinnati Products included within this Agreement." (*Id*. ¶ 7.)

The Agreement gives CIM the right to cancel the Agreement as follows:

> In the event that [VMI] fails to cure any default of any provision hereunder within [one hundred twenty (120)][4] days after delivery of notice by registered mail by [CIM] to [VMI], then [CIM] shall have the option of cancelling this Agreement or of instituting an action against [VMI] for damages resulting from the breach, or for specific performance, and in the event of cancellation due to a default, or breach of covenant by [VMI], then [VMI] shall not subsequently manufacture or sell any Cincinnati Products embodying any of the information or Know-How acquired by [VMI] from [CIM] hereunder.

(*Id*. ¶ 8.) The Agreement gives VMI the right to cancel the Agreement as follows:

> In the event of a termination of the Agreement by [VMI], [VMI] will not manufacture or offer for sale any Products specified in Schedule A for a period of three years after the date of termination of the present Agreement. Additionally, upon termination by either party, [VMI] shall return to [CIM] all drawings and documents showing engineering Know-How and pertaining to the manufacture of equipment. Moreover, [VMI] shall not disclose to others any information received from [CIM] in connection with the equipment during the time in which the Agreement was in force. . . .

(*Id*. ¶ 9.) The Agreement was for an eight-year term, renewable by VMI on a yearly basis. (*Id*.,

---

[4] The main Agreement includes a sixty-day period for curing any defaults, but an addition made to the main Agreement dated May 21, 1973 changed the period to 120 days. (Doc. 1-2.)

additions to the main Agreement dated May 21, 1973.)

On May 18, 1990, the parties executed an addendum to the 1973 Agreement. By that addendum, VMI agreed to not sell products in any territory not listed on Schedule B. (*Id*.) CIM and VMI also agreed that they would "enter into negotiations concerning territory expansion for financial considerations." (*Id*.) On November 29, 1990, the parties executed another addendum to the Agreement, this time specifying that all territories not listed as exclusive to VMI or to other parties were non-exclusive. (*Id*.) Relevant to this case is the fact that China is not listed as an exclusive territory. (*Id*.)

The parties executed another amendment to the 1973 Agreement in 1994. The 1994 Amendment again listed specific countries that were exclusive to VMI or to other parties, and China is not listed, making that territory non-exclusive. The 1994 Amendment also amended the definition of "Cincinnati Know-How" to include the following: "all technical knowledge, data, know-how, trade secrets, claims covered by patents, specifications and other information necessary to manufacture high-quality products." (*Id*.) The 1994 Amendment provided that "[e]ven if it may be determined that any part or all of the Cincinnati Know-How is no longer covered by an unexpired patent or has entered the public domain, VMI's obligation to pay royalties to CIM hereunder shall not lapse or terminate solely on account of such determination." (*Id*.) Pursuant to Paragraph 9 of the 1994 Amendment, the term of the Agreement was to be "continuing, until lawfully terminated by the parties hereto, as long as VMI uses the Technology or any CIM Improvement or Existing VMI Improvement to manufacture and sell Products." (*Id*.)

**D. THE HEARING**

### 1. Mr. Bohlen, CIM

At the September 30, 2009 hearing on CIM's Motion for a Preliminary Injunction, Joseph Bohlen testified on behalf of CIM.[5]  Mr. Bohlen is the vice president of technology, engineering, and sales for CIM's can washers.  Mr. Bohlen testified that the can washing machines manufactured by CIM are installed as one portion of a large can manufacturing plant.  Can washing machines, such as those made by CIM and VMI, are custom built to conform to customer specifications.  The washing machines are one of the biggest components in a can manufacturing plant.  The washing machines generally cost between $3 million to $4 million.

Mr. Bohlen described various details of can washing machine technology, such as how the machine cleans, dries, and readies cans for labeling; how the machine transports cans through the system; what materials the machine components are made of; what chemicals are used in the washing process; and how certain peripheral equipment facilitates the can washing process.  Mr. Bohlen testified about the time and money CIM invested in developing various components of the can washing machines.  The can washing machine business fluctuates depending on the growth of the beverage industry worldwide.  CIM, according to Mr. Bohlen, has fifty-two percent of the world market share in can washing machines and sells approximately four to five can washing machines a year.

Mr. Bohlen testified that CIM requires all its vendors and employees to sign confidentiality agreements in order to protect CIM's trade secrets.  According to Mr. Bohlen, the technology used by CIM is not in the public domain.  Mr. Bohlen testified that he has observed the can washing machines made by other manufacturers and that those manufacturers' machines

---

[5]  The transcript of Mr. Bohlen's testimony at the September 30, 2009 hearing was filed under seal as doc. 29.

were radically different.

After describing CIM's can washing machines and the business generally, Mr. Bohlen testified about the nature of the relationship between CIM and VMI.[6] He explained that CIM communicated with VIM about many topics and exchanged technical information over the thirty-year duration of their relationship. Employees of both companies visited the other approximately once a year, either in Holland or in Ohio, to discuss technical issues. Then, during the year 2000, management of CIM and VMI determined that they needed to renegotiate the 1973 License Agreement. From 2001 to 2006, the parties discussed modifications to the Agreement. In particular, the parties discussed the need to revise the list of geographical territories that would be exclusive to CIM, which would be exclusive to VMI, and which would be nonexclusive. The parties also discussed royalty rates. At no time did they formalize any of the proposed modifications.

At the same time the parties were discussing renegotiating the License Agreement, they also discussed VMI's intention to manufacture the can washing machines in China. In an email dated August 27, 2002, Piet Rademaker, VMI's vice president of sales and projects, invited CIM's owner Dave Schmitt to visit VMI's newly acquired facilities in Yantai, a city located in the province of Shandong, China. In that email, Mr. Rademaker noted that the Chinese facility was "perfectly suited for building canwashers. . . ." (Pl. Ex. 81.) Mr. Schmitt responded, "[t]hanks very much for the information. It was helpful and I will let you know if a trip to Yantai is in order." (*Id.*)

---

[6] Mr. Bohlen began working for CIM after he graduated from engineering school in 1975 and has worked for the company ever since. Mr. Bohlen testified that he was involved in designing can equipment in the 1970s and then began managing the product line, a role he continues to perform for CIM.

Decision-makers from VMI and CIM met in person on June 27, 2006 to discuss the future of the relationship between the two companies. CIM's vice president of sales, Ted Shader, recorded notes of the meeting. (Pl. Ex. 84.) According to Mr. Shader's notes, "VMI explained how their China facility in Shandong was operating, and indicated that . . . the can business . . . would be served from this facility." (*Id*. at 2.) Mr. Shader's notes from the meeting also indicate that "VMI would continue to do 'high level' engineering and manufacturing in E[pe] Holland, and do assembly work in China," a methodology that would "protect 'intellectual property rights' and sensitive proprietary engineering." (*Id*.)

VMI shifted certain operations to the Yantai facility shortly thereafter, as reflected in a September 2006 memorandum drafted by Mr. Shader and Mr. Bohlen. In that memorandum, Mr. Shader reported that VMI was "[c]urrently building can washer products in The Netherlands as well as in Yantai, China. They have recently subassembled washers in The Netherlands, and have finished the machinery in China. Their intent is to eventually build all can washers in China, even those that ship back to Europe." (Pl. Ex. 85.) Mr. Bohlen testified that it was his understanding that although VMI intended to assemble the can washing machines in China, the high-level engineering would continue to be done in Holland.

Approximately eighteen months passed, and the parties still did not renegotiate the License Agreement. Then, in April 2008, Mr. Bohlen and Mr. Shader of CIM met with VMI representatives, including Mr. Rademaker, in Amsterdam to discuss the License Agreement. In a memorandum dated April 15, 2008, Mr. Shader noted that parties discussed the following:

> All can washers are being fully built in China at this time. They have built a new facility in China . . . . This facility is about 2x the size of the original Yantai plant, and they expect to expand it.

>The Yantai plant(s) are now fully owned by VMI, no longer a joint venture.

(Pl. Ex. 87.)  During the April 2008 meeting, the parties also discussed issues related to the License Agreement, namely, the need to amend or re-write the agreement to specify territories and royalty rates.

CIM and VMI continued to try to negotiate an amended license agreement throughout the spring and early summer of 2008, as demonstrated by a July 14, 2008 email from VMI's president of sales and marketing, Harm Voortman, to Mr. Shader.  In that email, Mr. Voortman states that VMI is "of the opinion that after more than 30 years the Trade Secrets which are the basis for licensing are to be considered insufficient basis for continuation of the Agreement.  Our future relation can be on the basis of a License Agreement, provided you can offer sufficient new features for the Can washer, features which can be defined and can be proved to be outside public domain."  (Pl. Ex. 89.)  Mr. Voortman concluded the email by stating, "[w]e see it as imperative to come to quick resolve of the matter.  We consider December 31 2008 as a deadline before we need to conclude.  If we cannot come to a conclusion before that date, VMI will choose for discontinuation of our Agreement."  (*Id.*)

On September 18, 2008, Mr. Shader responded to Mr. Voortman's email and objected to Mr. Voortman's assessment of the viability of the trade secrets.  Specifically, Mr. Shader stated, "[o]ur current agreement/contract has no stipulation with regards to how old trade secrets become and their usefulness and that upon interpretation licensee party can choose to quit their contractual obligation."  (*Id.*)  Mr. Shader listed in his email twenty-three "'trade secrets' and proprietary CIM/VMI can washer/dryer attributes."  (*Id.*)  Mr. Shader also stated in the email that he understood VMI's position with respect to discontinuing the agreement if the parties had

not resolved their differences by December 31 and that "[a] discontinuation of our contractual agreement will be viewed and interpreted as 'termination' and 'breach of covenant by VMI' which is essentially notifying CIM that VMI is going to exit the can washer/dryer business and return all intellectual property, drawings, and acquired information back to CIM." (*Id.*) After Mr. Voortman received this email from Mr. Shader, he cancelled a meeting that had been scheduled between the parties for September 19, 2009. (Pl. Ex. 86.) In an email dated September 22, 2008, Mr. Voortman informed Mr. Shader that "it is probably only attainable to leave the Agreement as it is and continue the relation on that basis. . . . We will think this over and come back to you on this after some weeks." (*Id.*)

Further attempts to negotiate a revised Agreement were not fruitful. On June 9, 2009, J.J. Spanjer, VMI's president and CEO, informed CIM by letter that VMI had concluded that the license Agreement was no longer valid and would regard it as ended as of January 1, 2009. (Pl. Ex. 94.) In that letter, Mr. Spanjer stated that VMI was "in the process of gathering all of the drawings and documents [it was] required to return." (*Id.*) Mr. Bohlen testified that this was CIM's first indication that VMI was not going to continue to negotiate an amended licensing agreement. By letter dated June 17, 2009, VMI returned to CIM approximately 500 pages of documents. Mr. Bohlen testified that the documents returned could not possibly have been all of the information that CIM had conveyed to VMI over the thirty-five year relationship between the parties. Mr. Bohlen testified that within a month of receiving VMI's termination letter, a customer in Indonesia informed CIM that VMI was still selling can washing machines.

Until the first quarter of 2009, VMI paid CIM royalties on every can washing machine it sold. The royalty statements transmitted by VMI listed where the product was shipped; the

statement does not indicate where the product was manufactured. (Pl. Ex. 100.)

## 2. Mr. Rademaker, VMI

Mr. Rademaker, VMI's vice president of sales and projects, also testified before the Court at the hearing on Plaintiff's motion for injunctive relief. Mr. Rademaker first testified about VMI's history with respect to the manufacture of can washing machines. When VMI began manufacturing can washing machines in 1973, the manufacturing took place at VMI's site in Zwolle, Holland. VMI manufactured can washing machines at its Zwolle facility until 1984, at which time it moved the manufacturing to a facility in Epe, Holland. Manufacturing continued in Epe until 2005, when VMI moved production to Yantai, Shandong, China. According to Mr. Rademaker, all engineering for the machinery continues to be done only in Epe.

VMI's relationship with the Chinese facility began in 1996 when it entered into a joint venture with Yantai Rubber Machinery Co. Ltd. to establish VMI (Yantai) Machinery Co. Ltd. (Def. Ex. 3.)[7] In 2002, VMI purchased all the shares of VMI (Yantai) Machinery Co. Ltd. that it did not already own, making VMI (Yantai) a wholly owned subsidiary of VMI. (*Id*. Ex. 2.)

In 2002, VMI advised CIM of its plan to move can washing machine production to China.[8] There is no evidence that CIM expressed any objection to this plan. Correspondence between the parties relating to VMI's operations in China concerned the impact such

---

[7] The Declaration of Piet Rademaker in Support of Defendant's Opposition to Plaintiff's Motion for Temporary Restraining Order and associated exhibits is filed as doc. 11. The exhibits attached thereto are hereinafter referred to as "Def. Ex."

[8] In an email dated August 27, 2002, and discussed previously in this Opinion, VMI's Coos Spanjer described the Yantai facilities to CIM's Dave Schmitt and informed him that the facility was "perfectly suited for building canwashers." (Pl. Ex. 81.)

manufacture would have on the parties' rights to sell machines in that territory. The License Agreement at that time made China a non-exclusive territory, so both VMI and CIM were permitted to sell can washing machines in China. However, after VMI notified CIM of its intent to shift production of the can washing machines to its Yantai facility, CIM's position was that "so long as VMI builds machines for China in their China plant, the China market will exclusively belong to VMI." (Def. Ex. 23.) VMI started manufacturing can washing machines at the Yantai facility in 2005, and it paid royalties to CIM for each of the machines manufactured there until January 2009.

Mr. Rademaker testified that VMI takes extreme precautions to ensure the protection of its company secrets. VMI manufactures many types of machines at the Yantai facility in addition to can washing machines, and its security measures are intended to protect the company's secrets pertaining to all the machinery produced in China. For example, VMI conducts regular audits of the Yantai facility, both "open" and "covered," to learn whether there are any ways trade secrets might be compromised; it requires all workers to maintain confidentiality; and it has special guards around the premises who check everything that comes in and leaves the facility. (Tr. Hrg. Sept. 20, 2009, doc 32 at 34.) Mr. Rademaker testified that VMI would never consider doing any engineering outside Epe, Holland. (*Id*. at 33.) Further, VMI only sends files to Yantai "to the extent needed." (*Id*. at 34.) According to Mr. Rademaker, VMI's "existence depends on keeping our secrets our secrets." (*Id*. at 35.)

Mr. Rademaker's testimony then shifted to the relationship between VMI and CIM. According to Mr. Rademaker, the parties would regularly exchange information in order to troubleshoot issues that came up with the can washing machines. However, Mr. Rademaker

testified that after the year 2000, the amount of information coming to VMI from CIM began to decline and that there was very little in the way of new trade secrets. Meanwhile, VMI made changes to the can washing machine based on customer requests and European Union directives pertaining to safety.

Because VMI had made many design changes to the can washing machines it manufactured, and because the parties had ceased exchanging material design information, VMI determined in 2008 that it was no longer using any CIM intellectual property in the manufacture of its can washing machines. When, in July 2008, CIM sent VMI a list of components and technologies that it considered trade secrets being used by VMI, VMI engineers reviewed the list and determined that VMI was not using those components and technologies or that the information was in the public domain. VMI therefore concluded that the 1973 License Agreement requiring it to pay royalties to CIM was no longer valid, and it ceased paying royalties.

### C. CONSENT ORDER

Following the hearing on Plaintiff's Motion for a Preliminary Injunction, VMI voluntarily agreed to be bound by the terms of a Consent Order crafted to address certain issues raised by Plaintiff's Motion. Specifically, VMI filed a proposed Consent Order that states as follows:

> 1. VMI Yantai Ltd. hereby submits to the Courts' jurisdiction for purposes of this Order.
>
> 2. Seven (7) days after entry of this order and the setting up of an escrow account, VMI will pay into a Court escrow any royalties that have not yet been paid and will continue to do so in accordance with the terms of the 1973 License Agreement and its amendments attached to the Complaint throughout the pendency of

this litigation.

3.  The confidentiality restrictions contained in the 1973 License Agreement and its amendments will remain in effect and apply to both VMI and VMI Yantai Ltd. throughout the pendency of this litigation.

4.  VMI will comply with the royalty reporting terms and the audit provision contained in the 1973 License Agreement and its amendments.

5.  This Order shall be binding on the following persons who receive actual notice of this Order: the parties; the parties' officers, agents, servants, employees, and attorneys; and all other persons who are in active concert or participation with any of the persons or entities listed previously in this paragraph.

6.  The terms "Products" and "Cincinnati Products" shall have the same meaning as in the 1973 License Agreement and its amendments.

7.  VMI and VMI Yantai will continue to maintain and enforce, at minimum, the following security procedures:

    a.  Regular audits, both "open" and "covered," of VMI Yantai's facilities;
    b.  Limited transmission of CAD files to VMI Yantai's facility;
    c.  Inclusion of secrecy and non-compete agreements in employee handbooks;
    d.  Guards on the premises of VMI Yantai to ensure security.

8.  The parties will continue to sell Products or Cincinnati Products only into the territories in which they had rights to sell as of December 31, 2008.

9.  Sales of Products or Cincinnati Products manufactured by VMI and/or VMI Yantai shall continue to be made only by VMI.

10.  Nothing in this Order shall be construed as a waiver of any claims, defenses, rights, obligations, or arguments any party may have in the remainder of this litigation.

> 11. This Order shall remain in effect until a separate written agreement of the parties is reached regarding the disposition of this litigation or a further order is issued by the Court.

(Doc. 33-1.)

## II. DISCUSSION

Federal Rule of Civil Procedure 65 authorizes the Court to grant a preliminary injunction. When deciding whether to grant preliminary injunctive relief, the Court considers four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of preliminary injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served by issuance of preliminary injunctive relief. *See Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000); *see also Mason County Medical Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). "These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Id.* "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty Gov't.*, 305 F.3d 566, 573 (6th Cir. 2002).

### A. LIKELIHOOD OF SUCCESS

To obtain a preliminary injunction, a plaintiff must show more than a mere probability of success. The plaintiff "must demonstrate, among other things, a strong or substantial likelihood or probability of success on the merits." *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 35 (6th Cir. 1992). CIM's Complaint alleges that VMI has breached the License Agreement and misappropriated its trade secrets. Central to CIM's likelihood of success on these claims is

whether CIM authorized VMI's manufacture of can washing machines at its Yantai facility.

CIM asserts that manufacture of the machines in Yantai constitutes a breach of the License Agreement because Paragraph 1(a) provides that VMI has "an exclusive license to make *in its plant at Epe-Holland* all Cincinnati Products [listed in the Agreement] and to sell such machinery and equipment only in the Territory." (Doc. 1-2 (emphasis added).) However, other provisions of the Agreement are at odds with Paragraph 1(a). For instance, the first page of the Agreement specifies that VMI "is desirous of *manufacturing* and selling the Cincinnati Products in 'the "Territory,"' and [CIM] has agreed to grant a license to [VMI] *to manufacture*, use and sell the Cincinnati Products in the Territory." (*Id*. at 1 (emphasis added).) Additionally, paragraph 3(a) of the Agreement provides that CIM will supply VMI with all the information and knowledge necessary "to enable [VMI] *to manufacture* the Cincinnati Products in the Territory." (*Id*. ¶ 3(a) (emphasis added).) The Agreement is therefore ambiguous as to whether VMI is entitled to manufacture the Products anywhere in the Territory, which includes the entire world excepting North America, Australia, New Zealand, and Japan,[9] or whether it must manufacture the Products only in Epe, Holland.

Separately, CIM argues that VMI's use of trade secrets at the Yantai facility without CIM's permission violates the Agreement. CIM relies on the section of the Agreement that provides that the rights given to VMI under the Agreement are "personal" to VMI and that VMI does not have the right to grant sublicenses or transfer the Agreement without CIM's consent. (*Id*. ¶ 1(c),(d).). However, other sections of the Agreement contemplate that VMI will subcontract the manufacture of the machinery. Paragraph 4(a) calls for royalty payments on

---

[9] See Paragraph 3(a) of the 1994 Amendment, Def. Ex. 22.

products "manufactured by ***or on behalf of [VMI] or by some other person or company*** to which any of the Know-How relating to the Cincinnati Products has been supplied by, or through, or on behalf of or at the instance of [VMI]." (*Id.* ¶ 4(a) (emphasis added).) Additionally, Paragraph 4(b) provides for payments on products which are "in process of manufacture by [VMI] ***or by any subsidiary or associated firm or company of [VMI]***." (*Id.* ¶ 4(b) (emphasis added).)

"The role of courts in examining contracts is to ascertain the intent of the parties." *St. Mary's v. Auglaize Cty Bd. of Commrs.*, 115 Ohio St. 3d 387, 390, 875 N.E.2d 561, 566 (Ohio 2007) (citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos*., 86 Ohio St. 3d 270, 714 N.E.2d 898 (Ohio 1999)). The discrepancies in the Agreement make the parties' intent less than clear. CIM's reliance on certain portions of the Agreement that are inconsistent with other portions of the Agreement is insufficient to show it is likely to succeed on its claim that VMI has breached the Agreement by manufacturing the equipment in Yantai.

CIM also alleges that VMI breached the Agreement by ceasing its payment of royalties under the agreement. VMI's defense is that it validly terminated the Agreement after determining that it was no longer using any of CIM's trade secrets.

Two provisions of the Agreement are relevant to this inquiry. First, Paragraph 9 of the Agreement specifies that "[i]n the event of termination of the Agreement by [VMI], [VMI] will not manufacture or offer for sale any Products specified [in the Agreement] for a period of three years after the date of termination of the present Agreement." (Def. Ex. 20 ¶ 9.) Also, the 1994 Amendment to the Agreement provides that "[e]ven if it may be determined that any part or all of the Cincinnati Know-How is no longer covered by an unexpired patent or has entered the

public domain, VMI's obligation to pay royalties to CIM hereunder shall not lapse or terminate solely on account of such determination." (Def. Ex. 22 ¶ 5.) These contractual provisions indicate that VMI agreed to pay royalties to CIM even if the Agreement was no longer supported by trade secrets. Further, if VMI did validly terminate the Agreement, it is barred from selling any Cincinnati Products for three years from the date of termination.

Evidence introduced at the hearing on Plaintiff's motion persuades the Court that at least some of the technology currently used by VMI originated with CIM Know-How. VMI is still manufacturing and selling can washing machines, but it is not paying royalties. Because the Agreement specified that VMI is obligated to pay royalties or terminate the Agreement and refrain from selling Cincinnati Products for a period of three years, Plaintiff has demonstrated a likelihood of success on its claim that VMI's cessation of royalty payments violates the Agreement.

Finally, CIM claims that VMI misappropriated its trade secrets in violation of the Uniform Trade Secrets Act, codified in Ohio as Ohio Revised Code § 1333.61. Specifically, CIM argues that VMI has violated the Trade Secrets Act by using its trade secrets in Yantai without permission.

> Under the Ohio Uniform Trade Secrets Act, actual or threatened misappropriation of trade secrets may be enjoined. O.R.C. § 1333.62. A trade secret is something that encompasses both of the following: "(1) it derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) it is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." O.R.C. § 1333.61(D). The Ohio Supreme Court has looked to the following factors in analyzing whether a litigant possesses a trade secret:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.
>
> *State ex rel Besser v. Ohio State Univ.*, 89 Ohio St. 3d 396, 399-400, 732 N.E.2d 373 (2000).

*Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1005 (S.D. Ohio 2008). Under § 1333.61(B), "misappropriation" includes the disclosure or use of a trade secret of another without the express or implied consent of the other when the person using or disclosing the trade secret knew that the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy. Ohio Rev. Code § 1333.61(B)(2)(b). "If plaintiff proves the existence of a trade secret he still carries the burden of demonstrating that misappropriation has occurred or is threatened; simply stating that inappropriate use of the information is inevitable is not sufficient." *Prosonic Corp.*, 539 F. Supp. 2d at 1005 (citing *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1042-43 (N.D. Ohio 2003)).

The evidence shows that VMI informed CIM about its intent to move manufacturing operations from Epe, Holland to Yantai, China as early as 2002. Mr. Rademaker testified that CIM's reaction to the news was positive and that CIM encouraged VMI to begin manufacture in Yantai because it would help capture the emerging market in Asia. By April 2008, CIM knew that VMI was fully building all can washers in China. CIM does not dispute that it knew manufacturing was taking place in China. However, Mr. Bohlen testified that he did not realize the extent of the manufacturing being done there; he believed only the final assembly was being

done in China.

The greater weight of the evidence supports a conclusion that CIM gave either express or implied consent for VMI to use CIM trade secrets to the extent necessary to manufacture can washing machines in Yantai. Accordingly, even assuming that VMI is continuing to use CIM's trade secrets, CIM has not demonstrated a substantial likelihood that it did not give VMI permission to use these trade secrets in Yantai to the extent that VMI is presently using them.

Neither has CIM put forth evidence that VMI has actually disclosed or will disclose any trade secrets to a third party. Mr. Rademaker testified that all engineering continues to be done in Epe, Holland and that the company safeguards all its secrets in Yantai. Yantai is a wholly owned subsidiary of VMI, and there is no evidence that VMI has disclosed trade secrets to any entity other than VMI Yantai. CIM's unsupported assertion that the manufacture of can washing machines in China will inevitably result in disclosure of its trade secrets is insufficient to show a likelihood of success on its claim of misappropriation.

### B. IRREPARABLE INJURY

A plaintiff's harm is irreparable if it cannot be fully compensated by money damages. *Overstreet*, 305 F.3d at 578. Although no single factor is determinative of the availability of a preliminary injunction, *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985), a failure to demonstrate the existence of an irreparable injury absent a preliminary injunction can be fatal to a motion for preliminary injunction. *See*, *e.g.*, *Southern Milk Sales, Inc., v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991).

CIM states that permitting VMI to continue using its trade secrets would result in irreparable harm because it would confer an unfair competitive advantage on VMI in the

marketplace. Additionally, CIM states that allowing VMI to use the trade secrets in China would result in irreparable harm because the secrets will be revealed either by VMI's intentional disclosure to workers in Yantai or by theft.

CIM refers the Court to Ohio law that generally holds that equitable relief is a proper remedy for a violation of an agreement involving intellectual property because the injured party lacks an adequate remedy at law. For example, in *Wellman Engineering Co. v. Calderon Automation, Inc.*, 195 N.E.2d 568 (Ohio App. 1964), the court found that an injunction was appropriate where a licensor had breached an agreement that gave exclusive manufacturing rights to the plaintiff. The defendant licensor in that case had developed a system for manufacturing equipment used in the steel industry. The defendant licensed the sole and exclusive right to manufacture its equipment to the plaintiff licensee. *Id*. at 572. However, the defendant arbitrarily terminated the agreement with the plaintiff and then shifted business to other entities who were also manufacturing defendant's equipment. *Id*. at 574-75. The court concluded that the licensing agreement between the defendant and plaintiff was valid and binding and that the plaintiff had no adequate remedy at law. *Id*. at 576.

*Wellman Engineering*'s summary conclusion that the plaintiff had no adequate remedy at law does not provide this Court with much assistance in determining whether CIM has demonstrated irreparable harm in this case. The *Wellman Engineering* court did not discuss why money damages could not fully compensate the plaintiff. The Sixth Circuit has stated that "a plaintiff's harm is not irreparable if it is fully compensable by money damages." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). Accordingly, this Court must consider whether CIM has met its burden of demonstrating the inadequacy of money damages.

Additionally, the Sixth Circuit has specified that to demonstrate irreparable harm under the preliminary injunction test, a plaintiff must show that they will suffer "'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (quoting *Monsanto Co. v. Manning*, 841 F.2d 1126 (6th Cir. 1998)).

Mr. Bohlen stated in his affidavit, which CIM filed in conjunction with its Motion for Temporary Restraining Order (doc. 1-1), and in his testimony during the hearing on that Motion that CIM would experience irreparable harm if VMI is not enjoined from its manufacture of can washing machines outside the terms of the Agreement. Mr. Bohlen stated that CIM would lose profits and customer good will, citing as an example the fact that VMI recently lost a contract for a can washer in Indonesia and that CIM believes VMI was the successful bidder on that contract. (Bohlen Aff. ¶ 43.) Mr. Bohlen suggests that VMI has an unfair advantage over CIM when bidding on contracts because it is using CIM Know-How without paying royalties. Losing a bid for a can washing machine is significant, according to Mr. Bohlen, because so few (approximately four) can washing machines are sold in a year.

The evidence presented to the Court is insufficient to show that CIM faces the imminent threat of irreparable harm if VMI is not enjoined from manufacturing can washing machines in Yantai. VMI has been manufacturing can washing machines in Yantai since 2005. CIM has presented no evidence of harm caused by VMI's manufacture of the machines in Yantai as opposed to Epe. Although CIM suggests that its trade secrets will not be kept confidential if manufacturing is done in Yantai, there is no evidence to support this contention. To the contrary, Mr. Rademaker testified that VMI takes extreme precautions to ensure the protection of its company secrets. Additionally, Mr. Bohlen admitted on cross-examination that he had no

reason to think that VMI would make public the information it uses to manufacture can washing machines. Furthermore, the Consent Order proposed by VMI and being entering into the record simultaneous with the filing of this Order expressly provides that VMI and VMI Yantai will continue to maintain and enforce security procedures including regular audits, limited transmission of CAD files to Yantai, inclusion of secrecy and noncompete agreements in employee handbooks, and guards on VMI Yantai's premises.

If CIM is entitled to royalties that it is not receiving or if it is losing profits as a result of a breach on the part of VMI, CIM will be entitled to money damages. However, money damages are insufficient to warrant the extraordinary remedy of injunctive relief. Unlike in *Wellman Engineering*, the Plaintiff in this case has not put forth evidence that it will not have an adequate remedy at law.

### C. SUBSTANTIAL HARM TO OTHERS

CIM states that VMI will not be harmed if the Court orders VMI to cease its can washing machine manufacturing operations in Yantai because VMI is primarily in the business of making machinery for the tire and rubber industry — business that it could continue. Additionally, CIM states that if VMI wants to continue manufacturing can washing machines, it could simply shift the manufacturing operations back to Epe, Holland and pay royalties as is provided for in the Agreement. VMI responds that if the Court gives CIM the relief it seeks and orders VMI to shut down its Yantai operations until the termination of this litigation, VMI's can washing machine customers would have to renegotiate new arrangements under duress with CIM or others, resulting in harm to the customers. Additionally, VMI claims it would be harmed because it would lose its existing customers and the opportunity to put its investment in the Yantai facility

to work.  VMI also points out that the injunctive relief sought by CIM would substantially alter the status quo — that being VMI's manufacture of can washing machines in Yantai.

"The purpose of interlocutory injunctive relief is to preserve the status quo pending final relief and to prevent irreparable injury to the plaintiff — not simply to punish past misdeeds or set an example."  *Tenneco Automotive Operating Co. Inc. v. Kingdom*, No. 08-CV-10467, 2008 WL 4388899 (E.D. Mich. Sept. 25, 2008) (citing *American Bd. of Psychiatry and Neurology, Inc. v. Johnson-Powell, M.D.*, 129 F.3d 1, 4 (1st Cir. 1997)).  In this case, granting CIM the injunctive relief it seeks would substantially alter the status quo and cause substantial harm to VMI and VMI's customers.

### D.  PUBLIC INTEREST

The Court's final consideration is whether granting the injunction sought by CIM is in the public interest.  There are two rights at issue in this case: the right to contract freely, and the right to protect one's inventions.  The right to contract freely is well established.  *Bd of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972).  The parties in this case entered into a License Agreement that no longer meets their needs.  This Court will uphold the Agreement to the extent that it is proven valid.  At this stage of the litigation, however, the Court concludes that VMI's manufacturing in Yantai likely is within the ambit of the Agreement.  The fact that VMI has ceased paying royalties is, of course, a violation of the Agreement if that Agreement is valid.  However, an injunction is not inappropriate when money damages will suffice.

The public interest also is served by encouraging invention and protecting proprietary information.  "[B]y adopting the Uniform Trade Secrets Act . . ., the General Assembly has determined that public policy in Ohio . . . favors the protection of trade secrets."  *Al Minor &*

*Assoc. Inc. v. Martin*, 117 Ohio St. 3d 58, 63, 881 N.E.2d 850 (2008). The evidence presented to this Court demonstrates that any trade secrets being used by VMI are well guarded. Additionally, the Consent Order will bind VMI and VMI Yantai to the confidentiality provisions of the 1973 Agreement between VMI and CIM — an assurance that CIM seeks. The public interest in protecting trade secrets will not be compromised by VMI's continued manufacture of can washing machines in Yantai under the terms set forth in the Consent Order pending final resolution of this case.

## III.  CONCLUSION

The Court has considered the evidence and the four factors that it must in deciding whether to grant Plaintiff the injunctive relief it seeks. After weighing these factors, the Court finds that Plaintiff has failed to demonstrate that it will suffer irreparable harm if VMI continues manufacturing can washers in Yantai pending final resolution of this case, provided that VMI continues to implement and enforce the security measures already in place and described in the Consent Order proposed by VMI. With respect to any economic harm being caused to CIM by VMI's failure to pay royalties under the Agreement, such harm is compensable with money damages, and VMI will pay the royalties into escrow pending final resolution of the case.

For the foregoing reasons, Plaintiff's Motion for Injunctive Relief (doc. 2) and its Motion for Additional Time (doc. 9) are DENIED.

IT IS SO ORDERED.

_____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court